JFM:RAB
F.#2010R00826

**M10- 441**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

KENNETH MARSH,
BALDWIN ANDERSON,
    also known as "Bolton Anderson,"
ROBERT ANTHONY BUDION,
    also known as "Bobby Budion" and
    "Robert Anthony,"
JEANNE LADA,
    also known as "Jeanne Grecco,"
    and
JAMES T. LEVIER,
    also known as "JT,"

          Defendants.

- - - - - - - - - - - - - - - - - -X

**To Be Filed Under Seal**

COMPLAINT AND AFFIDAVIT
IN SUPPORT OF APPLICATION
FOR ARREST WARRANT

(18 U.S.C. § 371)

EASTERN DISTRICT OF NEW YORK, SS:

      EDWARD GALLASHAW, being duly sworn, deposes and says

that he is a Postal Inspector with the United States Postal

Inspection Service ("USPIS"), duly appointed according to law and

acting as such.

      Upon information and belief, there is probable cause to

believe that in or about and between January 2007 and April 2010,

both dates being approximate and inclusive, within the Eastern

District of New York and elsewhere, defendants KENNETH MARSH,

BALDWIN ANDERSON, also known as "Bolton Anderson," ROBERT ANTHONY

BUDION, also known as "Bobby Budion" and "Robert Anthony," JEANNE

LADA, also known as "Jeanne Grecco," and JAMES T. LEVIER, also known as "JT," did knowingly and intentionally conspire: (a) to devise a scheme and artifice to defraud Gryphon clients and to obtain money and property from Gryphon clients by means of materially false and fraudulent pretenses, representations and promises, and, for the purpose of executing and attempting to execute such a scheme and artifice, to transmit and cause to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343; (b) by use of the mails and means and instrumentalities of interstate commerce, directly and indirectly, to willfully employ a device, scheme and artifice to defraud clients and prospective clients contrary to Title 15, United States Code, Sections 80b-2(11), 80b-6 and 80b-17; and (c) to execute a scheme and artifice to defraud persons in connection with securities of issuers with a class of securities registered under section 12 of the Securities Exchange Act of 1934, contrary to Title 18, United States Code, Section 1348.

In furtherance of the conspiracy and to effect its objectives, within the Eastern District of New York and elsewhere, the defendants KENNETH MARSH, BALDWIN ANDERSON, also known as "Bolton Anderson," ROBERT ANTHONY BUDION, also known as "Bobby Budion" and "Robert Anthony," JEANNE LADA, also known as

2

"Jeanne Grecco," and JAMES T. LEVIER, also known as "JT," together with others, committed and caused to be committed, among others, the following:

OVERT ACTS

a.    In or about and between January 2007 and April 2010, the defendant KENNETH MARSH caused monies to be paid to, among others, the defendants BALDWIN ANDERSON, ROBERT ANTHONY BUDION, JEANNE LADA and JAMES T. LEVIER.

b.    On or about July 25, 2007, the defendant BALDWIN ANDERSON sent an email to Victim #1, an individual whose identity is known to me.

c.    In or about December 2008, the defendant ROBERT ANTHONY BUDION spoke on the telephone with Victim #5, an individual whose identity is known to me, and told him that BUDION was a gifted options trader.

d.    In or about and between January 2007 and April 2010, the defendant JEANNE LADA drafted text that appeared on the Gryphon website in which she claimed to be a trader.

e.    On or about January 6, 2010, the defendant JAMES T. LEVIER spoke on the telephone with Victim #8, an

3

individual whose identity is known to me.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

The source of your deponent's information and the grounds for his belief are as follows:

I. Background

1. I have been a Postal Inspector with the USPIS for approximately six years. The facts set forth in this complaint and affidavit are based on my interviews of investors, information obtained from the review of documents, and information obtained from others in law enforcement who participated in the investigation. In the portions of this complaint and affidavit that describe the contents of documents or statements of witnesses, they are reported in substance and in part, unless otherwise indicated.

2. Because I submit this complaint and affidavit for the limited purpose of establishing probable cause to arrest the defendants, I have not set forth all facts known to me about this investigation and case.

II. The Defendants and Gryphon Holdings, Inc.

3. In or about January 2007, the defendant KENNETH MARSH began soliciting business for Gryphon Holdings, Inc., a company that has done business under that name and the name Gryphon Financial up through the present. Gryphon Holdings Inc.

4

and Gryphon Financial (hereinafter, "Gryphon") provides customers with investment advisory and management services.  Gryphon employs approximately 25 to 30 people.  The company is located at 3767C Victory Boulevard in Staten Island, New York; the defendant KENNETH MARSH owns the company.

4.    The defendants BALDWIN ANDERSON, also known as "Bolton Anderson," ROBERT ANTHONY BUDION, also known as "Bobby Budion" and "Robert Anthony," JEANNE LADA, also known as "Jeanne Grecco," and JAMES T. LEVIER, also known as "JT," were Gryphon employees[1] during the period covered by this complain.

III. The Gryphon Scheme

5.    From in or about January 2007 to the present, Gryphon employees have used high-pressure sales tactics and a wide range of misrepresentations about the company to convince customers to buy Gryphon's fee-based services.  Packages of services range from $99 to $250,000 and typically include access to an electronically provided "newsletter" with investment recommendations and promotions for other Gryphon services, as well as access to the investment advisory services of Gryphon employees.   Once customers sign up for a certain package of services, Gryphon employees use the same tactics to sell the

---

[1]   Gryphon banking records reveal that many people who worked for Gryphon were paid as independent contractors. Throughout this affidavit, the term employee is used to include such individuals.

customers ever more expensive packages.  Over the course of the
scheme, the company took in more than $17.5 million using these
methods.

     A.    The Gryphon Sales Pitch

     6.    Gryphon primarily advertises its services through
internet advertisements and emails that link to a website that
encourages potential customers to purchase a newsletter and
submit contact information.  Gryphon employees then communicate
directly with the customers via telephone.  In all these formats,
the same misrepresentations are employed to fraudulently solicit
business.

     B.    Misrepresentations

     (i)    Gryphon's Fake Trading Desk

     7.    Gryphon's promotional materials and employees
regularly refer to the company's trading desk and tout its
traders' long experience and unparalleled expertise.  The website
claims that Gryphon's "ruthless" group of 10 traders have over
100 years combined experience and utilize a "secret strategy" to
"pull[] more money out of Wall Street than any other traders to
date."[2]  According to the website, these traders make the same
trades Gryphon recommends to its customers ("We are the only

---

   [2]    The Gryphon website evolves over time.  Quotes from the
website contained herein appeared on the website during the
period from October 2009 through April 2010.  Not all such quotes
are currently on the Gryphon website.

6

letter that's [sic] actually trades on our own recommendations –
We are traders – who trade!").   Gryphon employees regularly refer
to the existence and prowess of the Gryphon trading desk in their
conversations with customers.   Indeed, in one consensually
recorded conversation made during the course of the
investigation, a number of Gryphon employees can be heard
exulting in the background while another employee detailed the
action taking place at the trading desk to his customer.   In
fact, the defendant KENNETH MARSH admitted to investigators that
Gryphon does not have a trading desk.   MARSH stated that he
trades a small account of his own money, not Gryphon's, and that
he has no idea if any of his employees have trading accounts of
their own.

(ii) <u>Gryphon's Fake Hedge Fund</u>

8.   Gryphon's promotional materials and employees also
repeatedly refer to the company's various hedge funds.   For
example, the website claims that Gryphon's hedge fund began on
January 1, 2007, contains holdings in excess of $1.4 billion, and
that Gryphon itself is run by its hedge fund traders.   In fact,
the defendant KENNETH MARSH informed investigators that Gryphon
does not operate a hedge fund.

(iii) <u>Gryphon's Fake Employees</u>

9.   Gryphon promotional materials tout the trading and
investment prowess of Kenneth Maseka, who is purported to be

Gryphon's president, founding partner, owner, and head trader ("of Gryphon financial and all of its divisions"). He is described on the website as a billionaire stock picker whose returns over the last twelve years exceeded those of the country's top equity fund manager and Warren Buffet. In a quotation attributed to Maseka, he claims that it "took him less than 20 years to pull in revenues that exceed $50 billion." Gryphon claims that Maseka was educated at Harvard, then Oxford, after which he worked as a risk arbitrage trader at Goldman Sachs. Gryphon employees regularly refer to Maseka in their conversations with customers, certain "premium" service packages include personal access to Maseka, and numerous customers believe they have spoken with Maseka. In fact, the defendant KENNETH MARSH admitted to investigators that Maseka does not exist.

10. Gryphon promotional materials and employees also tout the trading and investment prowess of Michael Warren, who is purported to be Gryphon's vice-president, partial owner, chief financial strategist, head of equity hedge fund strategies, and manager of the firm's offshore hedge fund and structured products division. Gryphon informs its customers that Warren is a graduate of Columbia University and the Wharton School of Business, and that since Gryphon's portfolio began, he has maintained an average quarterly return of more than 100%. As with Maseka, Gryphon employees refer to Warren in conversations

8

with investors, "Warren" talks to investors, and various premium packages offer direct access to Warren. In fact, the defendant KENNETH MARSH admitted to investigators that Michael Warren does not exist.

11. Gryphon promotional materials and employees also tout the investment and trading prowess of John Gage, who is purported to be a partner of Gryphon Financial, the head of equity hedge fund strategies, and the manager of the offshore hedge fund and structured products divisions. Gage is claimed to have graduated from Colombia University and the Wharton School of Business, and comes from "a long line of investors and traders." In fact, the defendant KENNETH MARSH admitted that John Gage does not exist.

12. Gryphon promotional materials also trumpet the market experience and expertise of a variety of other individuals, including Chris Wolfe, a man whom investors are told has reaped an average profit per trade since 1995 in excess of 1000%; Marc Seigel, who is claimed to manage in excess of $700 million in daily option trading volume and whose "talents in trading options can be traced back five generations"; and Marcus Thorne, who is purported to have returned profits approaching 200% in a single day. In fact, the defendant KENNETH MARSH admitted to investigators that these individuals do not exist.

9

(iv) <u>Gryphon's Employees Often Use Fake Names</u>

13. In addition to the fake employees above, which Gryphon uses to solicit business, numerous Gryphon employees also use fake names to identify themselves in their communications with customers. The following names were all used by Gryphon employees in conversations with customers: Bolton Anderson, Jeanne Grecco, Anthony Lansing, Lisa Lansing, Bill Lanza, Paul Ross and Robert Vincent. None of these names appear in voluminous banking records detailing payments to Gryphon's employees from January 2008 through February 2010 - a period within which Gryphon victims, and in one instance a Postal Inspector posing as a victim, spoke to Gryphon employees who used these names.

14. The defendant JEANNE LADA, also known as "Jeanne Grecco," is a Gryphon employee who made numerous misrepresentations on the Gryphon website. Writing under the name Jeane Grecco, accompanied by a picture of "Grecco" that I have a compared to LADA's New York State driver's license photo and determined to be LADA, LADA presented herself as a trader at Gryphon whose recommendations to clients are based on "what I and my fellow traders are buying in our own portfolios." As Grecco, LADA also repeats many of the false statements noted above, including references to "self-made millionaire" Kenneth Maseka

10

and Michael Warren, with whom she claims to have been working
since 1991.

15.   On April 16, 2010, a USPIS inspector pretending to
be a disgruntled Gryphon customer named Paula Rosen, a name the
inspector made up during the call, placed a consensually recorded
telephone call to the main Gryphon number.  A woman who
identified herself as "Eva" answered the telephone.  In response
to a request to speak to either Michael Warren or Kenneth Maseka,
"Eva" explained that since it was late on a Friday and the market
was closing, both men had already left for the day.  "Eva" then
placed the inspector on hold, after which a different woman came
on the line. During the course of the call, this woman identified
herself as "Jeanne Grecco," stated that Michael Warren and
Kenneth Maseka were the owners of the company, and that she was
an editor there.  After asking the inspector's name, Grecco
informed the inspector that she had checked for the name Paula
Rosen in the Gryphon system, stating that she had searched for
every "Paula" and every "Rosen."

(v)   <u>False Testimonials</u>

16.   Gryphon's website and promotional materials also
contain numerous false testimonials concerning Gryphon's prowess.
For example, George Soros is quoted to have said, "Alone the
traders of Gryphon Financial are incredible, together the[y] are

11

unstoppable."  The defendant KENNETH MARSH admitted to investigators that testimonials on the Gryphon website are false.

(vi) <u>False Addresses</u>

17.  Gryphon's website, promotional materials and employees claim that the firm operates from a Wall Street office. For example, the website states, "Located in the heart of the financial world at 110 Wall Street, 11th Floor, New York, NY 10005, the traders here have been tearing up Wall Street since 1991."  In fact, the firm operates its office in a commercial space located in a strip mall on Staten Island and pays for the use of a "virtual address" on Wall Street.  This means that Gryphon pays a fee for a telephone number with a (212) area code that is forwarded to Staten Island, a mailing address from which mail is forwarded to Staten Island, and the use of an office in Manhattan, if it were needed.  According to a manager of the company that leases the "virtual office" to Gryphon, however, no Gryphon employee has ever used the office located on Wall Street.

18.  Gryphon also claims to possess offices in London, England and Sydney, Australia.  The defendant KENNETH MARSH admitted that no Gryphon employees work from these offices.

(vii) <u>False History</u>

19.  Gryphon's website and promotional materials variously refer to the firm operating as of 1991, 1994, 1996 and 1999.  In fact, the defendant KENNETH MARSH began soliciting

12

business for Gryphon in approximately January 2007. The company filed for status as a corporation in New York in March 2006.

IV.  Victim Interviews

20.  During the course of the investigation, the government has interviewed numerous individuals who were victims of the Gryphon scheme. The specifics of certain victims' interactions with various Gryphon employees are set forth below, but in general, the pattern was the same.

21.  The victims typically learned about Gryphon by receiving an unsolicited email or telephone call, after which they perused the Gryphon website. The false claims they received caused them to either sign up for one of Gryphon's packages of services or to request additional information. The victims then began to receive telephone calls and email communications from Gryphon employees which also contained misrepresenations. The purpose of such calls was to convince the victims who had not purchased a service package to sign up for one, and to convince those who had signed up to upgrade to more expensive ones. During these communications, in addition to false claims concerning Gryphon, the victims also frequently received detailed, personalized investment advice. Those who followed the advice typically lost money quickly. When that happened, Gryphon employees would utilize the same array of false claims in encouraging the victims to sign up for more expensive service

13

packages in order to receive a level of service that would allow them to turn their losses into profits. Once investors began to complain, the Gryphon employee who had handled their account typically ceased communications, even where the investor had paid for services for a set term that had not yet expired.

A.  Victim #1

22.  In approximately 2007, Victim #1, a 60-year-old retiree and veteran, decided to sign up for Gryphon's $99 "Network" and $89 "Ministry of Wealth" services after reading Gryphon's website. Victim #1 was impressed by, among other things, the firm's Wall Street address, Michael Warren and Ken Maseka's biographies, the claims that Gryphon's 10 traders were the best in the business, and the Gryphon testimonials. After signing up, Victim #1 received a call from the defendant BALDWIN ANDERSON, a Gryphon employee who identified himself by name. ANDERSON told Victim #1 that Gryphon managed several large hedge funds and that the firm's trading desk, including its international traders, possessed a phenomenally good track record. ANDERSON sold Victim #1 Gryphon's "Genome" and "Daily Options Trader" services for $999, and the "Private Plays" service for $20,000.

23.  In making the sales, ANDERSON promised Victim #1 exclusive services, including a toll free telephone number to connect him directly to the trading desk and allow him to talk

14

with the traders in real time, recommendations from Michael Warren, and direct access to Warren, with whom Victim #1 was told he was speaking on a numerous occasions.  During one such conversation, "Warren" told Victim #1 that he turned $1,000,000 into $16,000,000 in one year.

24.  For the $20,000 "Private Plays" service, ANDERSON told Victim #1 that he would receive one year of personal trading recommendations over the phone from Michael Warren.  During one of those sessions, "Warren" attempted to sell Victim #1 the $50,000 "Wolves of Wall Street" service.  When Victim #1 declined, "Warren" stopped receiving Victim #1's telephone calls. ANDERSON then called Victim #1 and explained that Warren was upset and that Victim #1 would have to buy the Wolves of Wall Street service to placate him.  Victim #1 agreed to the purchase.

25.  In approximately February 2008, based on conversations with "Michael Warren," Victim #1 gave "Warren" access to Victim #1's personal securities account, and paid "Warren" $50,000 to trade in the account.  Victim #1 also agreed to provide "Warren" with 20% of any profits made in the account. Over the next 60 days, "Warren" lost between $20,000 and $25,000 trading Victim #1's account.

26.  In approximately July 2008, based on conversations with ANDERSON, Victim #1 provided $100,000 to Gryphon to be traded personally by Michael Warren.  Since that time, despite

15

numerous attempts by Victim #1 to check on the status of his investment, he has been unable to find out what happened to the money. Gryphon did not return any of Victim #1's calls or emails, but ANDERSON did call him in June 2009 to attempt to sell him additional products and services. Victim #1 refused, and has been unable to recover any of the money he provided to Gryphon for services or investment.

B.   Victim #2

27.   In approximately July 2007, Victim #2, a 48-year-old man, received an email advertisement containing links to the Gryphon website. He reviewed the website, was impressed with the information presented there, and used his credit card to sign up for Gryphon's $99 "Daily Option Service." Victim #2 then received a telephone call from the defendant BALDWIN ANDERSON, who identified himself by that name over phone. During the call, ANDERSON attempted to sell Victim #2 Gryphon's $2,500 "Private Play" service. In the course of his sales pitch, ANDERSON told Victim #2 that the managers of the Private Play service were the same individuals who ran Gryphon's hedge fund. ANDERSON also informed Victim #2 that Gryphon had a trading desk and had an active seat on the New York Stock Exchange. Later that day, Victim #2 received a call from "Michael Warren," who told Victim #2 that he was an active trader who managed the Gryphon hedge fun, and attempted to sell Victim #2 the Private Play service.

16

Victim #2 decided not to purchase this service, but Gryphon later charged his credit card for it anyway.  On numerous occasions, Victim #2 called to complain and was told that he could not speak to ANDERSON.  On one such occasion, his call was routed to "Michael Warren," who informed him that ANDERSON was on the trading floor.

C.   Victim #3

28.   In approximately September 2009, Victim #3, a 48-year-old veteran, viewed the Gryphon website, was impressed by the information presented there, and after speaking with a Gryphon employee, decided to sign up for Gryphon's $999 "Elite Trader" service.  When Victim #3 lost more than $20,000 following Gryphon's trading recommendations, he repeatedly attempted to make contact with his prior representative without success.  On one such occasion, he spoke to a man who identified himself as "Michael Warren," who claimed that he worked out of Gryphon's Chicago office.  Later, Victim #3 received a call from "Robert Anthony," who asked Victim #3 to join "Anthony's" "trading team."

H.   Victim #4

29.   In approximately December 2008, Victim #4, a 78-year old retiree, received an email solicitation from Gryphon, after which he subscribed to Gryphon's free newsletter.  Victim #4 then received a call from "Robert Anthony," who convinced him to sign up for Gryphon's $495 "Elite Options" service, on which

17

he made an initial down payment of $199.  During the call, "Anthony" told Victim #4 that "Anthony" was a gifted options trader with an 80% success rate.  Later, "Anthony" sold Victim #4 another year of the "Elite Options" service for $199.  Victim #4 later received numerous calls from a man identifying himself as Michael Warren, in which "Warren" discussed the Gryphon hedge fund.  "Anthony" then told Victim #4 that he was being reassigned to manage Gryphon's hedge fund during a call in which he sold Victim #4 Gryphon's "Daily Option Trader" service for $999, applying his previous payments toward the total.  After a number of trades lost money and Victim #4 called to complain, he stopped receiving calls from "Anthony."

D.  <u>Victim #5</u>

30.  In approximately December 2008, Victim #5, a 62-year-old accountant, received an email solicitation from Gryphon, after which he viewed the Gryphon website.  Based on the information contained therein, he decided to sign up for the firm's $199 "Elite Option" service.  Victim #5 later received a call from a Gryphon representative named "Robert Anthony." "Anthony" told Victim #5 that he was gifted at picking options, that his trades were profitable 80% of the time, and that he had clients worth hundreds of millions of dollars who could move markets.  During the call, "Anthony" successfully sold Victim #5 the "Wolf Option Trader VIP" service for $999.  "Anthony" later

18

convinced Victim #5 to buy Gryphon's $20,000 "Private Plays"
service, for which he made an initial payment of $3,800.
Following Gryphon's trading recommendations, Victim #5 lost
significant amounts of money. When he complained and attempted
to get a refund, Gryphon cut off all communications with him,
despite the fact that he had purchased a lifetime service.

31. Gryphon banking records reveal that the firm paid
the defendant ROBERT ANTHONY BUDION $812,218.46 between January
2008 and February 26, 2010. On January 14, 2009, Victim #5 sent a
check for $3800 made out to Gryphon Financial. In the notation
line on the check, Victim #5 wrote, "ROBERT ANTHONY. BAL. OF
INITIAL TRADING FEE." This check was deposited on January 20,
2009. The deposit slip lists the check as "[Victim #5's last
name] $3,800" after which the initials "BB" appear and are
circled.

E. Victim #6

32. In approximately February 2009, Victim #6, a 69-
year-old retiree, received a call from a Gryphon employee which
prompted her to visit the firm's website. After viewing the
site, she signed up for Gryphon's "Elite Option" service for $500
based on the company's track record and the profiles of its
leaders. Victim #6 then received a call from "Bill Lanza," a
Gryphon employee who told her that he had a good track record
with options and attempted to sell her various Gryphon services.

19

Victim #6 eventually agreed to purchase three trade recommendations for $1000. "Lanza" later convinced her to make an initial payment toward Gryphon's $20,000 "Inner Circle" service. Victim #6 then began receiving calls from "Robert Anthony" who informed her that he could give her great trade recommendations if she paid the $20,000 balance on her account. When she paid it, "Anthony" began providing her with recommendations. These led to substantial losses. When Victim #6 called to complain, she could not reach "Anthony" and was eventually told that he was unavailable because he had been promoted to work at the firm's hedge fund. Victim #6 continued to complain and eventually did receive a call from "Anthony," who promised that he would take personal responsibility for her account and reverse her losses. Following "Anthony's" trading recommendations, Victim #6 lost more money. When she began to to complain again, in approximately October 2009, Gryphon informed her that it was cutting off all services and communications.

33.  On June 15, 2009, Victim #6 sent a check for $2,500 made out to Gryphon Financial. The check was deposited on June 18, 2009. On the deposit slip, the check is identified as [Victim #6's last name] 2,500," after which the initials "BB" and "BV" appeared.

34.  Over the course of the investigation, I have determined that (i) when the checks from a given victim are

20

deposited, initials that appear to correspond to the initials of the Gryphon employee who serviced that victim are noted on the deposit slip, (ii) the defendant ROBERT ANTHONY BUDION goes by the first name "Bobby," (iii) multiple deposit slips for checks from victims who spoke with "Robert Anthony" bear the initials BB, and (iv) no other Gryphon employee bears the initials BB. Based on this, in addition to the fact that "Robert Anthony" is a shortened version of the defendant ROBERT ANTHONY BUDION's real name, and that multiple Gryphon employees have used their real first names or versions of those names in their dealings with Gryphon's victims, I believe that the "Robert Anthony" who spoke to Victims #3, #4, #5 + #6 ~~#4 and #5~~ is in fact the defendant ROBERT ANTHONY BUDION.

     F.   <u>Victim #7</u>

     35. In approximately February 2009, Victim #7, a 74-year-old retiree, received a telephone call from a Gryphon employee who attempted to sell him the company's services. Following the call, Victim #7 visited the Gryphon website and purchased Gryphon's $99 "Raging Bull" service. Victim #7 then received a call from the defendant BALDWIN ANDERSON, who identified himself by name. Among other things, ANDERSON told Victim #7 that his colleague "Robert Anthony" was one of the top earners at Gryphon. Victim #7 later received a call from "Robert Anthony". "Anthony" told Victim #7 that a Michael Warren,

21

formerly of Goldman Sachs, ran Gryphon, and that "Anthony" worked with Gryphon for six years, was in the top five percent of the firm's earners, and that the "Raging Bull" service had been in existence for 17 years and the "Elite Options" service for eight years. "Anthony" attempted to sell Victim #7 a Gryphon service for $2,500. Instead, Victim #7 agreed to spend $1,400 for a specific trade recommendation. Although Victim #7 paid for this recommendation, he did not receive it. Following numerous calls in which he could not reach "Anthony," Victim #7 received a call from "Anthony" during which "Anthony" convinced Victim #7 to provide an additional $1000 in exchange for a year of recommendations and an additional number of special trades. Victim #7 then received a number of trade recommendations from "Anthony" on which he lost money. When "Anthony" demanded another $5,000 to continue the service, Victim #7 refused, and "Anthony" shut off his service.

G.    Victim #8

36.    In approximately July 2008, Victim #8, a 63-year-old New York State employee, received an email solicitation from Gryphon, after which he viewed the Gryphon website. Victim #8 then received a call from a Gryphon employee named "JT," who told him that he would make a lot of money if he followed "JT's" recommendations and sold Victim #8 Gryphon's $199 "Raging Bull" service. "JT" later sold Victim #8 Gryphon's "Put Play of the

22

Day" service for $999, and the "Pure Profit Elite" service for $5,000.

37.   On January 6, 2010, in a consensually recorded conversation between "JT" and Victim #8, "JT" told Victim #8 that (i) he had "traders" and a "research team" who worked for him, (ii) he could provide Victim #8 with a trade for $1,000 that his research team, rated "a seven on a scale of five," and (iii) he had just had a conversation about the trade with "Mike," his "top researcher," which he then proceeded to relate.  According to the defendant KENNETH MARSH, no one at Gryphon beside MARSH, and occasionally the defendant JEANNE LADA, conducts any research.

38.   On March 17, 2010, after determining the address of the defendant JAMES T. LEVIER, who I had learned to be a Gryphon employee through the firm's payroll records, I placed a call to the telephone number associated with that address.  A man who responded to "JT" picked up the telephone and admitted that he worked at Gryphon and sold Gryphon's services.  I identified this man's voice to be the same as that of the "JT" who spoke with Victim #8 on January 6, 2010.  Based on this, I believe the "JT" who spoke to Victim #8 to be the defendant JAMES T. LEVIER.

39.   On December 10, 2009, I attempted to make a consensual recording of a conversation between Victim #8 and "JT."  Victim #8 was informed that JT was unavailable, but would immediately return his call.  In fact, Victim #8's call was

23

returned shortly thereafter by the defendant BALDWIN ANDERSON, who identified himself by his real name.  In the consensually recorded call that followed, among other things, in attempting to sell Victim #8 access to Michael Warren's trading expertise through Gryphon's $20,000 "VIP" service, ANDERSON told Victim #8 that (i) he and JT had been "with Mr. Warren" when Victim #8 called, (ii) he was "Mr. Warren's assistant," (iii) he worked with Mr. Warren "for seven years here," (iv) Warren was his "mentor, my friend, and on some days [] my worst enemy," (v) Warren "came out of Lehman Brothers 17 years ago," (vi) Gryphon had over 260,000 subscribers that were a by-product of the hedge funds Warren ran, (vii) Warren had executed a number of spectacular trades, (viii) Warren's service "caters to the investment banking firms we deal with," and (ix) the VIP service is "where the real money is. . . . The only thing I can do for you is put money in your pocket."

40.  On April 15, 2010, I placed a telephone call to a number listed on the defendant BALDWIN ANDERSON's bank records as his home number.  The defendant BALDWIN ANDERSON picked up the telephone, responded to the name Baldwin Anderson, and admitted that he worked at Gryphon and sold Gryphon's services.  I identified this man's voice to be the same as that of the "Baldwin Anderson" who spoke with Victim #8 on December 10, 2009.

24

I.   Victim #9

41.   In approximately October 2008, Victim #9, a 69-
year old retiree, who had viewed the Gryphon website, signed up
for Gryphon's $199 "Put Play" service following a telephone
conversation with the defendant JAMES T. LEVIER, who identified
himself on the call as "JT Levier." During the call, LEVIER said
that the people who ran Gryphon were hedge fund managers who
possessed many contacts in the financial industry and made a lot
of money trading on the same recommendations they provided to
Gryphon clients who subscribed to the firm's $20,000 "Inner
Circle" service. LEVIER stated that by joining the Inner Circle,
Victim #9 could avail himself of the same trades the top traders
at Gryphon made for themselves. In one conversation, LEVIER
informed Victim #9 that if he invested $10,000 in March, he would
have $20,000 by June and $50,000 by December. Based on these
statements, Victim #9 signed up for the Inner Circle service,
making an initial payment of $1,500 and agreeing to pay the
remainder in installments over time, which would come exclusively
from his trading profits. LEVIER then provided Victim #9 with
specific trade recommendations over the telephone, including the
amounts to spend based on Victim #9's description of his
financial status and documents he sent to LEVIER to review
detailing the same. When Victim #9 called to complain about the
poor performance of the recommended trades, LEVIER replied that

25

he could only provide Victim #9 with better trades once Victim #9 made further payments toward his Inner Circle balance. Victim #9 then paid LEVIER an additional $9,020. With this payment, recommendations resumed.

42. In approximately June 2009, Victim #9 purchased a a "One Time Position" trade for $2,000 from a Gryphon employee who identified himself as "Paul Ross." The defendant JAMES T. LEVIER had previously told Victim #9 that he could trust "Ross." In return for the $2,000, "Ross" told Victim #9 to purchase Western Refining Inc. call options. Western Refining is a security of an issuer with a class of securities registered under section 12 of the Securities Exchange Act of 1934. When Victim #9 saw the value of the Western Refining call options decline, he called LEVIER, who told him to buy additional options because the price would soon increase. Victim #9 followed this advice, and ultimately lost thousands of dollars on the trades. When Victim #9 requested a refund of his costs for Gryphon's services, LEVIER refused, told him never to call back and hung up the phone. From that point forward, Victim #9 stopped receiving Gryphon trade recommendations.

VI. The Defendant KENNETH MARSH's Admissions

43. On October 16, 2009, the defendant KENNETH MARSH and his attorney participated in a telephone conference with investigators and attorneys of the United States Securities and

Exchange Commission (the "SEC"). Prior to the start of the interview, MARSH was told, among other things, that (1) he was not obligated to speak with the SEC, (2) he could end the interview at any time, and (3) he could consult with his attorney at any time. MARSH said that he understood these warnings, and that he was proceeding voluntarily.

44. During the course of this interview, MARSH made numerous admissions, including those noted above.

V.   Conclusion

45. Given the confidential nature of this continuing investigation, I respectfully request that this complaint and affidavit be maintained under seal until this court or another court of competent jurisdiction orders otherwise, except that inspectors of the USPIS may disclose this complaint and affidavit and the arrest warrant as necessary to effectuate the arrest and arraignment of the defendants.

WHEREFORE, your deponent respectfully requests that the defendants KENNETH MARSH, BALDWIN ANDERSON, also known as "Bolton Anderson," ROBERT ANTHONY BUDION, also known as "Bobby Budion"

and "Robert Anthony," JEANNE LADA, also known as "Jeanne Grecco,"
and JAMES T. LEVIER, also known as "JT," be dealt with according
to law.

Edward Gallashaw
Postal Inspector
U.S. Postal Inspection Service

Sworn to before me this
19th day of April, 2010

United
Eastern      S | Levy      Judge
                          rk

28