SBK:MLY/RB
F.#2010R00826

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - X
SECURITIES AND EXCHANGE COMMISSION,

                    Plaintiff,

             - v. -

GRYPHON HOLDINGS, INC., d/b/a GRYPHON
FINANCIAL and GRYPHON DAILY, KENNETH E.
MARSH a/k/a "KENNETH MASEKA," "MICHAEL
WARREN," and "MARCUS THORN," BALDWIN
ANDERSON a/k/a "BOLTON ANDERSON,"
ROBERT ANTHONY BUDION, a/k/a "BOBBY          10 CV 1742 (JBW)
BUDION" AND "ROBERT ANTHONY," JEANNE M.
LADA a/k/a "JEANNE GRECCO" and
JAMES T. LEVIER,

                    Defendants,

and

RICHARD BORRELO, NICOLE MARSH, GINNA
MUNGIOVI, MICHAEL SCARPACI, DOMINIC
SPINELLI, and PAUL STOKES,

                    Relief Defendants.

- - - - - - - - - - - - - - - - - - X

          MEMORANDUM OF LAW IN SUPPORT OF GOVERNMENT'S
          <u>MOTION TO DISQUALIFY COUNSEL FOR KENNETH MARSH</u>


                              LORETTA E. LYNCH
                              United States Attorney
                              Eastern District of New York
                              271 Cadman Plaza East
                              Brooklyn, New York 11201

ROGER BURLINGAME
MICHAEL L. YAEGER
Assistant U.S. Attorneys
(Of Counsel)

TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT.......................................... 1

FACTS......................................................... 3

    I.    Ms. Flotteron's Involvement in Marsh's Criminal Conduct  4

    II.   Marsh's Citation of Legal Advice ...................... 6

    III.  Marsh's Intention to Pay for Co-defendant Anderson's
         Lawyer ............................................... 8

LEGAL STANDARD................................................ 9

ANALYSIS..................................................... 15

    I.    Kim Flotteron is Implicated in the Crimes Charged
         Against Her Own Client and Thus Must Be Disqualified .. 15

    II.   Ms. Flotteron's Law Firm, Jaffe & Falk, Should be
         Disqualified Because Her Conflicts Cause Potential Civil
         Liability for the Firm, Jeopardize Professional
         Standards, and Create the Appearance of Unfairness .... 16

    III.  The Court Should hold a Curcio hearing with Marsh on
         the potential conflicts of Adorno & Yoss Regarding an
         Advice of Counsel Defense ............................ 17

    IV.   The Court Should hold a Curcio Hearing with Anderson
         on the Potential Conflicts of a Lawyer Paid for by
         His Co-defendant ..................................... 20

CONCLUSION................................................... 20

TABLE OF AUTHORITIES

Page

**Cases**

United States v. Jones, 381 F.3d 114 (2d Cir. 2004)........ 9, 10

United States v. Cancilla, 725 F.2d 867 (2d Cir.1984)......... 14

United States v. Curcio, 680 F.2d 881 (2d Cir. 1982)...... *passim*

United States v. Fulton, 5 F.3d 605 (2d Cir.1993)............. 14

United States v. Gonzalez-Lopez, 548 U.S. 140 (2006).......... 9

United States v. Iorizzo, 786 F.2d 52 (2d Cir. 1986)...... 10, 11

United States v. Jiang, 140 F.3d 124 (2d Cir. 1998)........... 11

United States v. Lech, 895 F.Supp. 586 (S.D.N.Y. 1995)........ 10

United States v. Levy, 25 F.3d 146 (2d Cir. 1994)............. 10

United States v. Malpiedi, 62 F.3d 465 (2d Cir. 1995)......... 10

United States v. Manuel Ramos, 350 F.Supp.2d 413
  (S.D.N.Y. 2004) ........................................ 12, 13

United States v. Rahman, 861 F.Supp. 266 (S.D.N.Y. 1994)...... 19

United States v. Zichettello, 208 F.3d 72 (2d Cir. 2000)...... 12

Wheat v. United States, 486 U.S. 153 (1988).............. *passim*

Witt v. United States, No. 86 Civ. 7766-CSH, 1987 WL 6422
  (S.D.N.Y. Feb. 3, 1987) ................................... 18


**U.S. Constitution**

U.S. Const. amend. VI........................................ 8

Page

**Other Authorities**

American Bar Association, Model Code of Professional
  Responsibility, Ethical Consideration 5-1 .................... 12

Restatement (Third) of the Law Governing Lawyers § 121
  (2000) ...................................................... 9

Restatement (Third) of the Law Governing Lawyers § 123(1)
  (2000) .................................................. 15, 16


**Regulations**

Title 22 of New York Codes, Rules and Regulations ("NYCRR"),
  Part 1200, Rule 3.7 ....................................... 17

PRELIMINARY STATEMENT

Pursuant to United States v. Curcio, 680 F.2d 881 (2d Cir. 1982), the government writes to notify the Court of several conflicts relating to the criminal case, United States v. Marsh, et al., M10-441 (the "Criminal Case"), that may bear on defendant Kenneth Marsh's motion here to "carve out" money from the asset freeze in order to pay his lawyers.

Ms. Kim Flotteron, a lawyer for defendant Kenneth Marsh, has an unwaivable conflict due to her involvement in Marsh's criminal conduct and must be disqualified.  The firm that Ms. Flotteron is associated with, Jaffe & Falk, LLP ("Jaffe & Falk"), cannot fully separate itself from Ms. Flotteron's conduct; if nothing else, the firm has potential civil liability springing from her actions.  Although most conflicts are waivable, and Marsh may be able to waive the conflict as it relates to Jaffe & Falk, the Court should not accept such a waiver here.  The firm's conflicts are too likely to prevent the Court from conducting the trial "within the standards of the profession" and from ensuring that "the legal proceedings appear fair to all who observe them."  Wheat v. United States, 486 U.S. 153, 160 (1988).  Disqualifying Jaffe & Falk is therefore within the Court's discretion and entirely appropriate.

There is also an issue associated with Marsh's lawyers at Adorno & Yoss, LLP ("Adorno & Yoss").  Marsh's affidavit here in the civil case, <u>S.E.C. v. Gryphon Holdings, Inc. et al.</u>, 10 CV 1742 (JBW) (the "Civil Case"), suggest that his criminal defense might rest in part on the advice of counsel at Adorno & Yoss, which would render his lawyers at that firm witnesses in the Criminal Case.  Marsh's lead counsel in the Criminal Case, Fred Schwartz of Adorno & Yoss, has told the government that he does not intend to pursue such a defense at trial, but even so, Marsh is entitled to unconflicted legal advice on the merits of such a defense.  The government therefore respectfully requests that the Court determine if a waivable conflict exists and, if it does, that it conduct a hearing pursuant to the procedures set out in <u>Curcio</u> and its progeny.

Finally, there is the issue posed by Marsh's intention, stated through his counsel, to provide money to pay for a lawyer for Baldwin Anderson, one of Marsh's codefendants. If this is in fact what Marsh intends to do, the government respectfully requests that the Court determine if a waivable conflict exists with respect to Anderson, and, if so, that the Court conduct a <u>Curcio</u> hearing on that matter as well.

FACTS

On April 19, 2010, the Hon. Robert M. Levy, United States Magistrate Judge, signed a criminal complaint and arrest warrants for Kenneth Marsh and others.  The criminal complaint charged Marsh and his co-defendants with conspiracy to commit securities fraud, investment advisor fraud, and wire fraud, in all violation of 18 U.C-2 § 371.  The Criminal Complaint alleges that Gryphon's customers paid anywhere from $99 to $250,000 to obtain Gryphon's fee-based investment advice services, and that the Defendants solicited customers by telling them lies in internet advertisements, newsletters, and telephone conversations.  Chief among the lies they told was that Gryphon was run by a man of extraordinary experience and talent in the financial industry, Kenneth Maseka.

Gryphon's promotional materials describe Kenneth Maseka, as Gryphon's president, founding partner, owner, and head trader.  The website describes Maseka as a billionaire stock picker whose returns over the last twelve years exceeded those of Warren Buffet.  Further, Gryphon's promotion materials claim that Maseka was educated at Harvard and Oxford, and that he had worked as a risk arbitrage trader at Goldman Sachs. Similarly, the investigation to date has revealed that Gryphon employees regularly refer to Maseka in their conversations with

customers, that certain "premium" service packages include personal access to Maseka, and that numerous customers believe they have spoken with Maseka.  But as Marsh eventually admitted to investigators, Maseka does not exist.  He is merely an alter ego for Marsh, who is not a billionaire, did not attend Harvard or Oxford, and never worked for Goldman Sachs.  In short, Ken Maseka, a major selling point for Gryphon, was a lie.

I.   Ms. Flotteron's Involvement in Marsh's Criminal Conduct

Ms. Flotteron served as Ken Marsh's attorney in his divorce action in New York State court, which was filed months before April 2010 and under Marsh's own real name, not the alternative identity of "Ken Maseka."  The investigation to date has revealed that Ms. Flotteron made numerous visits to Gryphon's offices in Staten Island before April 2010.

Investigation has also revealed that on or about April 1, 2010, defendant Marsh and Ms. Flotteron had a phone call with "C-1," a customer of Gryphon Holdings, Inc. ("Gryphon").  More specifically, C-1 said that when C-1 picked up the phone, both "Ken Maseka" and Maseka's lawyer, Ms. Flotteron, were on the line and seemed to be in the same room together using a speaker phone.  C-1 further stated that the phone call concerned a lawsuit that Maseka had filed against former Gryphon employees, and that Maseka claimed these former employees had stolen

computers and files from Gryphon.  One of those employees, Maseka told C-1, was "Greg Lehman," C-1's account representative at Gryphon.  Maseka and Ms. Flotteron asked C-1 to sign an affidavit stating that Lehman had asked C-1 to follow him to a new company.  C-1 agreed to sign an affidavit to that general effect, and received it and faxed it back to Ms. Flotteron either that same day or the next day, April 2, 2010.[1]  After C-1 faxed the affidavit to Ms. Flotteron, C-1 called her on the phone and asked some questions.  In particular, C-1 asked Ms. Flotteron why Greg Lehman's name was not on the lawsuit. According to C-1, Ms. Flotteron told C-1 that "Greg Lehman" was a fake name, and that Lehman's real name was on the lawsuit.  C-1 also stated that Ms. Flotteron avoided stating what Lehman's real name was.

Another Gryphon customer, "C-2," also spoke to Marsh and Ms. Flotteron, but on successive phone calls from Marsh and then his lawyer.  First, C-2 received a call from a man who introduced himself as "Ken Maseka" of Gryphon.  As a customer of Gryphon, C-2 stated, C-2 had already heard about Maseka by reputation.  "Maseka" told C-2 that he had filed suit against former Gryphon employees who had stolen confidential information

---

[1] A redacted copy of C-1's affidavit, with a redacted copy of Ms. Flotteron's cover letter, is attached as <u>Exhibit A</u>.

from Gryphon, including "Michael Stern," the Gryphon
representative who handled her account.  "Maseka" also told C-2
that he had just learned that "Michael Stern" was a fake name
that his employee was using, and that he ("Maseka") was outraged
by that lie.  C-2 stated that Maseka asked C-2 sign an affidavit
describing efforts by "Stern" to have C-2 follow him to a new
company.  "Maseka" also told C-2 that his lawyer, Ms. Flotteron,
would call C-2 about the affidavit.

     Ms. Flotteron did indeed call C-2, and, according to
C-2, made very similar statements to "Maseka."  Like "Maseka,"
Ms. Flotteron also told C-2 that she and "Maseka" had just
learned that "Michael Stern" was a fake name that a Gryphon
employee was using, and that Marsh was outraged by that lie.
C-2 recalls that Ms. Flotteron said something to the effect that
she also thought the lie was outrageous.  Ms. Flotteron sent C-2
an affidavit which C-2 signed on or about April 2, 2010.[2]

II.  Marsh's Citation of Legal Advice

     The investigation to date indicates that Marsh
repeatedly told multiple Gryphon employees that their actions
were legal, and that, in effect, Gryphon's business model had
been approved by lawyers.  Among other things, Marsh claimed

_____

[2] A redacted copy of C-2's affidavit, with a redacted copy of Ms.
Flotteron's fax cover sheet, is attached as Exhibit B.

that Gryphon employees could describe themselves as "traders" if they traded securities for their own accounts.  On May 14, 2010, Marsh filed an affidavit in the Civil Case, Document 54-1, "Reply Affidavit of Kenneth Marsh in support of application to allow a carve out from frozen assets," that further suggests Marsh's habit of citing the support of legal counsel.  In his affidavit, Marsh repeatedly cited his understanding of the securities laws and his efforts to comply with them, and he referred to advice he received from his lawyers:

- "To the best of my understanding of the law, neither Gryphon nor I were ever required to register as investment advisors."  (Aff. ¶ 5; emphasis added.)

- "We wanted to be sure that any issues raised by the [customers'] complaints were resolved, and any procedural errors corrected so that we would be in strict compliance with the law.  (Aff. ¶ 13; emphasis added.)

- "A number of our subscribers would frequently call our office asking for personalized investment advice.  I often lectured our staff about the fact that we were not permitted to do that.  As mentioned above, we also informed our subscribers that we could not do that."  (Aff. ¶ 15C.)

- "In addition to walking the office to monitor calls, I had meetings at least twice a weeks [sic], and sometimes twice a day, to insure that the employees on the telephones complied with all legal requirements."  (Aff. ¶ 15D; emphasis added.)

- "In fact, many of these claims [in Gryphon employees' representations and advertisements] were demonstrably true, and the remainder are immaterial "puffing" claims designed only to market subscriptions, not securities, and which no rational investor given the total mix of information would rely solely on for investment decisions."  (Aff. ¶ 15F.)

- "I do not know and did not explore the investment portfolios of the other employees of Gryphon, but I made it clear to them that I would not tolerate dealing in or the sale of securities that we were about to recommend, front running operations or any other similar nefarious activities.  <u>I should make it clear that to the Court [sic] that my counsel made it clear to me that any such conduct could lead to serious legal repercussion [sic].</u> Our receipts signed by our customers also made that crystal clear."  (Aff. ¶ 17B; emphasis added.)

III. <u>Marsh's Intention to Pay for Co-defendant Anderson's Lawyer</u>

Mr. Schwartz, counsel for defendant Marsh at Adorno & Yoss, has stated that Marsh intends to pay for Anderson's lawyer.  Mr. Schwartz also alluded to this matter in the conference before the Court on May 20, 2010:

> MR. SCHWARTZ: As long as we are adding things, Judge, you might have seen a somewhat familiar face in the courtroom, Mr. Frisch. Mr. Frisch wants to represent one of the other defendants in the case, Mr. Anderson, and Mr. Marsh as the head of Gryphon would
>
> not object to some of Gryphon's assets being used to pay Mr. Frisch.

(T. 26-27).

LEGAL STANDARD

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI.  However, the courts have clarified that the Sixth Amendment right to assistance of counsel actually comprises two parts, the right to counsel of one's choice, and the right to effective counsel.  See Wheat v. United States, 586 U.S. 153, 159 (1988); United States v. Gonzalez-Lopez, 548 U.S. 140, 148 (2006).  When these two rights are in opposition, the defendant's right to an effective advocate trumps.  See United States v. Jones, 381 F.3d 114, 119 (2d Cir. 2004) ("while a district court is required to recognize the presumption in favor of the accused's chosen counsel, such presumption will be overcome by a showing of an actual conflict or a potentially serious conflict").

An effective advocate is, by definition, an advocate unimpaired by conflicts of interest.  See United States v. Perez, 325 F.3d 115, 125 (2d Cir. 2003).  "A conflict of interest is involved if there is a substantial risk that the lawyer's representation of the client would be materially and adversely affected by the lawyer's own interests or by the lawyer's duties to another current client, a former client, or a third person."  Restatement (Third) of the Law Governing Lawyers

§ 121 (2000) ("Restatement").  Conflicts are either potential or actual.  United States v. Lech, 895 F.Supp. 586, 589-90 (S.D.N.Y. 1995).  Potential conflicts exist when "the interests of the defendant could place the attorney under inconsistent duties in the future."  Id. (citing United States v. Jones, 381 F.3d 114, 119 (2d Cir. 2004)).  Actual conflicts exist "when the attorney's and the defendant's interests 'diverge with respect to a material factual or legal issue or course of action.'"  Id. (citing Jones, 381 F.3d at 119).

Accordingly, in determining whether an attorney is so conflicted that he is ineffective, a court must determine whether he has "an actual conflict, a potential conflict, or no conflict at all."  Perez, 325 F.3d at 125.

If, upon further examination, a defendant's chosen counsel has no conflict whatsoever, then a court has no authority to disqualify him.  If the conflict is such that a rational defendant could knowingly and intelligently choose to continue to be represented by the conflicted attorney, the Court must obtain directly from the defendant a valid waiver in accordance with the procedures set forth in Curcio.  See, e.g., United States v. Malpiedi, 62 F.3d 465, 470 (2d Cir. 1995); United States v. Levy, 25 F.3d 146, 153 (2d Cir. 1994); United States v. Iorizzo, 786 F.2d 52, 58-59 (2d Cir. 1986).  In

summarizing the Curcio procedures, the Second Circuit has
instructed the trial court to:

> (i)   advise the defendant of the dangers arising from
>       the particular conflict;
>
> (ii)  determine through questions that are likely to
>       be answered in narrative form whether the
>       defendant understands those risks and freely
>       chooses to run them; and
>
> (iii) give the defendant time to digest and
>       contemplate the risks after encouraging him or
>       her to seek advice from independent counsel.

Iorizzo, 786 F.2d at 59; see also Curcio, 680 F.2d at 888-90.
By routinely relying on waivers of potential conflict claims,
courts are spared from having to wade into the intricacies of
those claims.  See United States v. Jiang, 140 F.3d 124, 128 (2d
Cir. 1998).

"At the other end of the spectrum, if [a] court
determines that counsel has an actual conflict that is so severe
as to indicate per se that the rendering of effective counsel
will be impeded," then the court "must . . . disqualify
counsel."  Id.  In such circumstances counsel must be
disqualified as a matter of law.

The Second Circuit has also made clear that there is a
middle ground between the two extremes of required
disqualification and prohibited disqualification.  If a district
court determines that an attorney's conflict was actual but

lesser, or that the conflict was merely potential, then the
district court may, but need not, accept a defendant's waiver of
the conflict.  See Perez, 325 F.3d at 125 ("And if, between
these two extremes, the court determines that the "attorney
suffers from a lesser [actual conflict] or only a potential
conflict," then it may accept a defendant's knowing and
intelligent waiver of his right to conflict-free counsel and
permit the defendant to be represented by the attorney of his
choice.")(emphasis added and citations omitted); see also United
States v. Manuel Ramos, 350 F.Supp.2d 413, 423 (S.D.N.Y.
2004)(Lynch, J.)("That a conflict is potentially waivable may
mean that the Court is not required to disqualify counsel, but
it does not mandate that such a waiver be accepted.").  In fact,
there is considerable discretion in this middle ground, as the
Court of Appeals has held that "[a] district court has
'substantial latitude' to require disqualification even where
defendants have attempted to waive any potential conflict."
United States v. Zichettello, 208 F.3d 72, 104 (2d Cir. 2000),
quoting Wheat v. United States, 486 U.S. 153, 163 (1988)
(emphasis added).

        A district court must "recognize a presumption in
favor of [a defendant's] counsel of choice," but that
presumption may be overcome where there is a 'serious potential

for conflict' that would jeopardize the interests in ethical practice and the appearance of fairness identified by the Supreme Court in <u>Wheat</u>." <u>Manuel Ramos</u>, 350 F.Supp.2d at 164. In other words, disqualification of counsel is appropriate when it supports the federal courts' "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that the legal proceedings appear fair to all who observe them." <u>Wheat v. United States</u>, 482, 153, 160 (1988).

The ethical standards of the profession that courts have an independent responsibility to preserve include rules against representations that conflict with a lawyer's loyalty or personal interest. "The professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of his client and free of compromising influences and loyalties." American Bar Association, Model Code of Professional Responsibility, Ethical Consideration ("EC") 5-1. "A lawyer should not accept proffered employment if his personal interests of desires will, or there is a reasonable possibility that they will, affect adversely the advice to be given or services to be rendered to the prospective client." <u>Id.</u>, EC 5-2. In sum, a client is entitled to a lawyer's "independent professional judgment." <u>Id.</u>, Canon 5.

The Second Circuit has held that a per se conflict is present, and thus no prejudice need be shown, when a lawyer is implicated in the very crimes charged against his client. United States v. Cancilla, 725 F.2d 867, 869-71 (2d Cir.1984); see also United States v. Fulton, 5 F.3d 605, 611-12 (2d Cir.1993) (per se conflict existed where government witness testified to defense counsel's involvement in criminal activity related to charges against client).  The Second Circuit's rule in Cancilla arises from the concern that a lawyer would not provide effective assistance because he would fear that "a vigorous defense might uncover evidence or prompt testimony revealing his own crimes." 725 F.2d at 870.  Thus, the Second Circuit reasoned, "[i]t is difficult to see how counsel conflicted in this way could impartially have given [the defendant] advice on whether or not to take a guilty plea, since counsel might have feared that acceptance of a plea would turn on [the defendant]'s cooperation, which might lead to discovery of the link to counsel's own activities."  Id.

ANALYSIS

I.   Kim Flotteron is Implicated in the Crimes Charged
     Against Her Own Client and Thus Must Be Disqualified

        Statements by Gryphon customers indicate that Ms.
Flotteron, a lawyer for defendant Marsh, was aware of Marsh's
use of an alias and yet perpetuated this fraud upon Gryphon's
customers in the course of litigating Marsh's dispute with
various former employees.  Ms. Flotteron had already litigated
Marsh's divorce by the time she joined him on a phone call with
C-1 in which Marsh posed as Ken Maseka.  Moreover, when speaking
to C-2, Ms. Flotteron expressed outrage at a Gryhphon employee's
use of a fake name and thereby showed that she understood the
impropriety of putting forth a fake identity.  Given that
Marsh's fraud continued after C-1 and C-2 filed their
affidavits, and that Marsh's use of the Maseka identity was a
crucial element of that fraud, Ms. Flotteron is implicated in
the very crimes charged against her client.  Without the fake
investment success, educational pedigree, and work experience of
"Ken Maseka," many fewer people would have been defrauded – and
Ms. Flotteron acted to perpetuate Marsh's ruse.  Under United
States v. Cancilla, therefore, Ms. Flotteron appears to have a
per se conflict. 725 F.2d 867 (2d Cir.1984).  At all events, she
should be disqualified from the Criminal Case as her

participation would jeopardize the federal courts' "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that the legal proceedings appear fair to all who observe them." Wheat v. United States, 482, 153, 160 (1988).  For the same reasons, it would be inappropriate for Ms. Flotteron to continue as counsel on the substantially related Civil Case.

II.  Ms. Flotteron's Law Firm, Jaffe & Falk, Should be Disqualified Because Her Conflicts Cause Potential Civil Liability for the Firm, Jeopardize Professional Standards, and Create the Appearance of Unfairness

      The firm that Ms. Flotteron is associated with, Jaffe & Falk, cannot fully separate itself from Ms. Flotteron's conduct.  As a general matter, conflicts of one lawyer are imputed to other lawyers who "are associated with that lawyer in rendering legal services to others through a law partnership, professional corporation, sole proprietorship, or similar association."  Restatement § 123(1).  But even if this were not so, Jaffe & Falk has a conflict due to its potential civil liability to Gryphon customers arising from Ms. Flotteron's conduct.  This potential liability raises the specter that Jaffe & Falk's continued involvement in the Civil Case the and Criminal Case would prevent the Court from conducting a trial "within the standards of the profession" by providing Marsh with "independent professional judgment" free of "personal interests

or desires" that have a reasonable possibility of adversely affecting their advice to Marsh.  EC, Canon 5.  In addition, the close connection between Ms. Flotteron and the other lawyers at Jaffe & Falk, a relatively small law firm, could create an appearance of unfairness to an outside observer.

Although most conflicts are waivable, and Marsh may be able to waive the conflict as it relates to Jaffe & Falk, the Court should not accept such a waiver here.  The firm's conflicts are too likely to prevent the Court from conducting the trial "within the standards of the profession" and from ensuring that "the legal proceedings appear fair to all who observe them."  Wheat v. United States, 486 U.S. 153, 160 (1988).  Disqualifying Jaffe & Falk is therefore within the Court's discretion and entirely appropriate.

III. The Court Should hold a Curcio hearing with Marsh on the potential conflicts of Adorno & Yoss Regarding an Advice of Counsel Defense

Marsh's statements and conduct strongly suggests that his criminal defense might rest in part on the advice of counsel at Adorno & Yoss, which would render his lawyers at that firm witnesses in the Criminal Case.

Advice of counsel is not a complete defense, but instead addresses mens rea only.  A defendant who claims the defense does not argue that someone else did the wrongful act,

or that the wrongful act did not happen, or even that the act was wrongful.  Rather, a defendant seeking refuge in the advice of counsel says "I did it, but my lawyer told me it was legal." Witt v. United States, No. 86 Civ. 7766-CSH, 1987 WL 6422 at *4 (S.D.N.Y. Feb. 3, 1987).

Marsh's statements to employees to the effect that Gryphon's business model was approved by lawyers, as well as his more specific assurances, such as his claim that Gryphon employees could honestly call themselves "traders," are signs that Marsh was considering the utility of an advice of counsel defense long before the SEC filed its complaint.

Once that complaint was filed, Marsh indicated that his views had not changed when he submitted an affidavit that made numerous references to the securities laws, his understanding of those laws, and his efforts to comply with them.  For example, Marsh claimed that his misrepresentations were mere "puffing" that "no rational investor" would rely upon. (Aff. ¶¶ 15F and 17F.)   He also explicitly referred to legal advice given to him by his counsel.  (See ¶ 17B.)  Together, these statements strongly suggested an intention to rely on an advice of counsel defense.

Marsh did not explicitly mention in his affidavit a particular lawyer whose advice he relied upon, but he has been

represented by Adorno & Yoss, and specifically Jan Atlas, Esq., since at least October 2009.  On that date, Atlas wrote a letter on behalf of Gryphon to the New York State Attorney General that in which he stated that "[w]e are informed by Gryphon that it is not an investment advisor and that it relies upon the 'publisher's exclusion' from the definition of 'investment adviser' as provided by Section 202(a)(11) of the Investment Advisers Act of 1940."  If Marsh were to put forth an advice of counsel defense, there is a distinct possibility that Mr. Atlas could be a witness, and that result would run afoul of the professional rule "that may require a lawyer to withdraw from representing a client when that lawyer is in a position to be a witness."  United States v. Rahman, 861 F.Supp. 266 (S.D.N.Y. 1994); see also Title 22 of New York Codes, Rules and Regulations ("NYCRR"), Part 1200, Rule 3.7 (limiting the ability of a lawyer to act as an advocate before a tribunal in which the lawyer is likely to be a witness).

Marsh's lead counsel in the Criminal Case, Fred Schwartz of Adorno & Yoss, has told the government that he does not intend to pursue such a defense at trial, but even so, Marsh is entitled to unconflicted legal advice on the merits of such a defense.  The government therefore respectfully requests that the Court determine if a waivable conflict exists and, if it

does, that it conduct a hearing pursuant to the procedures set out in Curcio and its progeny.

IV.  **The Court Should hold a Curcio Hearing with Anderson on the Potential Conflicts of a Lawyer Paid for by His Co-defendant**

Finally, there is the issue posed by Marsh's intention, stated through his counsel, to provide money to pay for a lawyer for Baldwin Anderson, one of Marsh's codefendants. If Marsh were to provide funds for this purpose, it raises the possibility that Anderson's lawyer might not be sufficiently diligent in investigating leads, introducing evidence, or making arguments on behalf of Anderson that might tend to incriminate or cast suspicion on Marsh.  Further, Anderson's lawyer might not provide independent advice concerning possible cooperation with the government to the extent that such decisions could adversely affect Marsh.  The government therefore respectfully requests that the Court determine if a waivable conflict exists with respect to Anderson, and, if so, that the Court conduct a Curcio hearing on that matter as well.

<u>CONCLUSION</u>

For the reasons stated above, the government respectfully requests that the Court (i) disqualify Ms. Flotteron from both the Criminal Case and the Civil case; (ii) disqualify Ms. Flotteron's firm, Jaffe & Falk, from both the

Criminal and the Civil Case; (iii) conduct a <u>Curcio</u> hearing for Marsh regarding the advice of counsel defense; and (iv) conduct a <u>Curcio</u> hearing for Anderson regarding the receipt of services from a lawyer paid for by a co-defendant.

Dated:    Brooklyn, New York
          June 7, 2010

                                        Respectfully submitted,

                                        LORETTA E. LYNCH
                                        United States Attorney
                                        Eastern District of New York

By:    ____/s/_____
                                        Michael L. Yaeger
                                        Assistant U.S. Attorneys
                                        (718) 254-6075